1

2

3

4

5

6

7

8              **IN THE UNITED STATES DISTRICT COURT**

9            **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11    VERA SAZHNEVA,                    No. CIV S-08-0300-CMK

12              Plaintiff,

13        vs.                            MEMORANDUM OPINION AND ORDER

14    COMMISSIONER OF SOCIAL
      SECURITY,
15
                Defendant.
16    _____/

17              Plaintiff, who is proceeding with retained counsel, brings this action for judicial

18    review of a final decision of the Commissioner of Social Security under 42 U.S.C. § 405(g).

19    Pending before the court are plaintiff's motion for summary judgment (Doc. 15) and defendant's

20    cross-motion for summary judgment (Doc. 16).

21                          **I.  PROCEDURAL HISTORY**

22              Plaintiff applied for social security benefits on November 8, 2005.  In the

23    application, plaintiff claims that her disability began on April 1, 2002.  In her application[1],

24    _____

25         [1]     In her motion for summary judgment, Plaintiff claims her disability is caused by a
      combination of carpal tunnel syndrome, varicose veins, back and joint pain, left shoulder
26    tendinitis, hip and ankle pain, incontinence, polyneuropathy, restless leg syndrome, left knee

Plaintiff claimed her disability is caused by a combination of varicose veins, back, leg and joint pain, incontinence, numbness of feet and hands, and headaches.  Plaintiff's claim was initially denied.  Following denial of reconsideration, plaintiff requested an administrative hearing, which was held on August 29, 2007, before Administrative Law Judge ("ALJ") Peter F. Belli.   In a September 27, 2007, decision, the ALJ concluded that plaintiff is not disabled based on the following relevant findings:

> 1.      The claimant has not engaged in substantial gainful activity since November 8, 2005, the application date (20 CFR 416.920(b) and 416.971 *et seq.*).
>
> 2.      The claimant has the following severe impairments: varicose veins, mild scoliosis and spondylosis of the lumbar spine, a history of bilateral carpal tunnel syndrome, left foot bone spur, and obesity (20 CFR 416.920(c)).
>
> 3.      The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).
>
> 4.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform the full range of light work with occasional climbing, stooping, kneeling, crouching, squatting, or crawling.  Light work involves lifting no more than 20 pounds occasionally, with frequent lifting or carrying of objects weighing up to 10 pounds.  The full range of light work requires standing or walking a total of approximately 6 hours of an 8 hour work day with normal work breaks.
>
> 5.      The claimant is capable of performing past relevant work as boiler operator.  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 416.965).
>
> 6.      The claimant has not been under a disability, as defined in the Social Security Act, since November 8, 2005 (20 CFR 416.920(f)), the date the application was filed.

After the Appeals Council declined review on December 15, 2007, this appeal followed.

---

arthritis, bilateral heel spurs, headaches, and obesity.

## II.  SUMMARY OF THE EVIDENCE

The certified administrative record ("CAR") contains the following evidence, summarized chronologically below:

2005

August 11, 2005  – Plaintiff was seen for a new patient physical examination. Plaintiff presented with a history of varicose veins and obesity.[2]

August 16, 2005 – Plaintiff had a venous ultrasound of her left lower extremity. The findings of that ultrasound were: "There is no intraluminal sound stopping material seen throughout the left lower extremity venous system.  Full compressibility is achieved on the left." The impression was:  "No evidence of deep venous thrombosis in the left lower extremity." (CAR 154).

August 19, 2005 – Plaintiff had a full physical at the Sacramento Refugee Clinic. It appears she arrived in the United States in February 2005, from the Ukraine.  As part of this physical, Plaintiff had a normal chest x-ray.  Her history included fractures, swelling, and varicose veins in her left leg.

October 20, 2005  – Plaintiff was seen for joint pain, ankle and hip pain, and varicose veins.  She was diagnosed with obesity, osteoarthritis, and carpal tunnel syndrome.  The doctor ordered x-rays of her left ankle and hips.  The doctor noted she had positive Tinel's sign, positive Phalen sign, her BMI was 40.3, her carpal tunnel (confirmed by EMG) was worse on right than left, and plantar fasciitis.  She was prescribed Tylenol, compressive stockings, and wrist splints.

/ / /

---

[2]     The court notes that a majority of Plaintiff's treating physician's notes are largely illegible.  The court attempts, as best as it can, to decipher what Plaintiff has been seen for and what treatment was provided.  However, most of the doctor's assessments of Plaintiff are illegible.  Neither party has provided a summary of the medical evidence, nor have they objected to the ALJ's summary of the medical evidence.

1   Normal x-ray of Plaintiff's hips and pelvis.  The hip x-ray showed:  "The femoral

2   heads are well located within the acetabulm.  The joint spaces are well maintained.  No

3   subchondral cysts or spurs are demonstrated.  The SI joints appear normal.  No pelvic fractures

4   are demonstrated."  (CAR 147).  An x-ray of Plaintiff's ankle found: "The mineralization is

5   within limits of normal.  The ankle mortise is well maintained.  There is a very small spur along

6   the anterior margin of the tibia at the ankle.  No fractures or destructive lesions are noted.  There

7   are several soft tissue calcifications which may represent some small pheboliths.  The patient has

8   calcaneal spurs at both planter and Achilles insertion sites into the calcaneus."  The impression

9   from the ankle x-ray was: "No fracture or significant arthritic change is noted.  Calcaneal spurs.

10   Some faint soft tissue calcifications most likely representing pheboliths."  (CAR 147-48).

11   November 16, 2005  – Plaintiff was seen for office visit.  It appears Plaintiff was

12   complaining about pain in legs and hips, as well as back pain and bladder incontinence.  She was

13   referred to a neurologist, and for x-ray of the lumbar and cervical spine.

14   November 28, 2005  – Plaintiff was assessed by a neurologist.  It appears she

15   complained about pain in ankles and cramping in her legs.  She had positive Tinel's sign, and

16   was assessed with restless leg syndrome, polyneuropathy, and mild headaches.

17   Plaintiff also had a nerve conduction study, conducted by Dr. Rafanov, which was

18   abnormal.  Her history was noted to include numbness, weakness in hands, and she had positive

19   Tinel's on examination.  Her baseline was "moderately severe median neuropathy at wrist, more

20   pronounced on right."  (CAR 187).

21   2006

22   May 4, 2006  – Consultative internal medicine evaluation by Dr. Gabriel S.

23   Borges.  During the examination, Plaintiff stated her chief complaints were varicose veins,

24   polyarthralgia, stress incontinence, carpal tunnel syndrome, headaches and heel spurs.  On

25   examination, Dr. Borges found Plaintiff was able to walk with a non-antalgic gait, but her gait

26   was slow and guarded.  She was able to sit unassisted, but her movements were slow getting onto

the examination table.  She was able to lie in supine position without assistance.  Plaintiff was unable to do deep knee full squats due to right hip and knee pain, and was only able to squat about 50% of the way down.  She was unable to do heel-knee-shin maneuvers, heel or toe walk, Romberg, or tandem.  She took short, careful, guarded steps in a straight line.  Her range of motion was grossly within normal limits in the cervical spine region, as well as the knee, ankle, shoulder, elbow and wrist joints.  In the lumbar spine region, her range of motion was:  flexion 0-70 degrees, extension 0-10 degrees, and lateral flexion 0-15 degrees.  Her hip joints range of motion on the left was: forward flexion 0-100 degrees, backward extension 0-30 degrees, rotation-interior 0-20 degrees, rotation-exterior 0-30 degrees, abduction 0-25 degrees, and adduction 0-15 degrees.  On the right, her range of motion in her hip joints were: forward flexion 0-80 degrees, backward extension 0-10 degrees, rotation-interior 0-30 degrees, rotation-exterior 0-40 degrees, abduction 0-30 degrees, and adduction 0-10 degrees.  Plaintiff's straight leg raising was negative bilaterally.  She had positive Tinel's and Phalen's on the right, positive Tinel's on the right, negative Phalen's on the left.

Dr. Borges's general findings were as follows:

1.      Right hip does reveal some crepitus and tenderness to palpation with range of motion.  No dislocation, no redness or fluctuans.
2.      Mild L5-S1 spinal tenderness with flattening of the lumbar lordotic curve.  No scoliosis noted.
3.      Bilateral heels were tender.  No gross deformity.
4.      Skin exam did reveal some varicose veins in the lower extremities bilaterally.
5.      Hands reveal no gross deformity, no Heberden's or Bouchard's notes.

(CAR 168).

Dr. Borges also found Plaintiff's muscle bulk, tone and strength equal and symmetric in the upper and lower extremities at 5/5 bilaterally.  Her grip strength on the right was 15 pounds, and on the left was 22 pounds.  She had good manual dexterity bilaterally.  Dr. Borges's diagnosis was:

/ / /

> 1.      Carpal tunnel syndrome.  Objective findings reveal positive
> Tinel's and Phalen's on the right and positive Phalen's on the left.
> Full range of motion.  Good manual dexterity.
> 2.      Hip.  We cannot rule out degenerative arthritis.  I did find
> some palpatory tenderness on the right of the trochanteric joint
> with some crepitus noted with decreased range of motion.  The
> claimant has pain with deep knee squatting.
> 3.      History of varicose veins bilaterally.  Good pulses.
> 4.      Stress incontinence of the bladder.
> 5.      History of headaches secondary to concussion.  Neurologic
> exam nonfocal.
> 6.      History of heel spurs per medical progress notes.  I did
> reveal some bilateral tenderness to both heels, palpatory, weight-
> bearing pain.

(CAR 169).  Based on his objective findings, Dr. Borges set the following functional limitations:

lifting, carrying, pushing, or pulling at a maximum of twenty pounds, with ten pounds frequently;

use of her hands for gross manipulation is limited to an occasional basis; avoid climbing;

frequently reach overhead; continuous bending, squatting, or stooping limited to occasional due

to her heel findings; sit a total of six to eight hours; standing or walking limited to fifteen to

thirty minutes at a time, for a maximum of two hours a day; communication limited due to a

language barrier; no other visual or auditory limitations; and no assistive devices are needed.

　　　May 26, 2006 – Non-examining agency residual functional capacity (RFC)

assessment set Plaintiff's exertional limitations at: occasionally lifting and/or carrying 20 pounds;

frequently lifting and/or carrying 10 pounds; standing and/or walking for a total of about six

hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; and

the unlimited ability to push and/or pull, other than as shown for lift and/or carry.  Plaintiff's

postural limitations were set at never climbing ladders, occasionally climbing ramp or stairs,

stooping, kneeling, crouching, and crawling, and frequently balancing.  Her manipulative

limitations were unlimited except her handling (gross manipulation), which was limited to

occasional in both upper extremities.  No visual communicative, or environmental limitations

///

///

were established.  Plaintiff's credibility was determined to be low because her allegations of severity were only partly supported by the objective treatment, and the fraud investigation.[3]

The consultant noted his conclusions were different than a treating or examining source, explaining that the limitation in Plaintiff's ability to stand/walk for two hours a day was not supported by her non-antalgic gait and mild findings consistent with osteoarthritis.

September 14, 2006 – Plaintiff was seen for low back, ankle and leg pain.  It appears she was prescribed naproxen.

Lumbar spine and right hip x-ray for history of low back pain.  The lumbar spine x-ray showed "Spondylosis and scoliosis."  The finding "shows a mild scoliosis with spondylotic changes is seen.  Vertebral bodies are normal in height.  Posterior elements and paraspinal soft tissues are normal."  The right hip x-ray was normal, finding "Bone architecture and alignment are normal.  No fracture or dislocation is seen."  (CAR 221)

October 19, 2006 – Plaintiff was seen for an office visit.  It appears she was complaining of low back pain, reporting pain at a level of seven out of ten.

October 24, 2006 – Dr. Rafanov did another nerve conduction study.  Dr. Rafanov noted Plaintiff's history included low back pain, and numbness in feet.  On examination, Plaintiff had positive straight leg raising on right, decreased sensation in distal lower extremities.  The conclusion was abnormal study, bilateral lumbar radiculopathy and sensory polyneuropathy.

November 2, 2006 – Plaintiff was seen for low back pain.    It appears she was referred to physical therapy.

/ / /

---

[3]      This RFC was a reconsideration of a prior RFC.  On January 11, 2006, the original non-examining physician RFC found Plaintiff capable of occasionally lifting 20 pounds, frequently lifting 10 pounds, standing and walking for six hours, sitting for six hours, unlimited ability to push or pull, frequently balance, occasionally climb, stoop, kneel, crouch, or crawl, and no manipulative limitations.  This assessment was completed without a treating or examining source statement.

1    <u>December 14, 2006</u> – Office visit for what appears to be left leg pain.  Plaintiff

2 was prescribed ibuprofen.

3    <u>2007</u>

4    <u>March 22, 2007</u> – Plaintiff was seen for what appears to be shoulder pain.

5    <u>March 27, 2007</u> – Plaintiff began physical therapy for shoulder joint pain.  She

6 had shoulder joint pain at a level of seven out of ten at rest, and eight out of ten with activity.

7 The pain was dull and radiating.

8    <u>April 24, 2007</u> – Plaintiff was seen for ankle pain, and possibly joint pain.  After

9 nine physical therapy treatments, Plaintiff's shoulder pain had decreased from a level of seven to

10 eight down to a level of two to three, a 60% improvement.

11    <u>May 9, 2007</u> – Plaintiff had an x-ray of her chest and left ribs due to complaint of

12 pain.  The chest x-ray was normal, with findings that "PA view of the chest shows the heart,

13 aorta, and mediastinum are normal.  The lungs are clear.  No skeletal abnormality.  No evidence

14 of tuberculosis is seen."  The left ribs x-ray showed "No displaced rib fractures."  The findings

15 were "Images of the ribs show bone architecture and alignment are normal.  No fractures or

16 dislocations are seen."  (CAR 222).

17    <u>May 29, 2007</u> – Office visit for unknown reason due to illegible notes.

18    <u>June 28, 2007</u> – Plaintiff was seen for what appears to be knee joint and ankle

19 pain.

20    <u>July 2, 2007</u> – A radiology report indicates Plaintiff had an x-ray which showed

21 evidence of osteoarthritis.

22    <u>August 9, 2007</u> – Medical assessment by Plaintiff's treating physician, showed

23 Plaintiff had marked limited abilities.  He found Plaintiff would be able to walk, stand, and sit for

24 less than one hour a day, each.  He limited her ability to lift at five to ten pounds occasionally,

25 and found she was partially limited in climbing stairs or ladders.  She was restricted in bending,

26 and would require rest periods during the day.  However, she did not have any emotional

problems, and was on no medication.  He estimated she would be unable to perform the full

range of sedentary work, work an eight-hour day five days per week, and she experienced pain on

a level of six to seven, out of ten.

       <u>August 14, 2007</u>  – Plaintiff began physical therapy for back and knee pain.  Her

pain was rated at seven out of ten at rest, and eight out of ten with activity.  The pain was dull

and radiating.

       <u>August 27, 2007</u>  – After five physical therapy treatments, Plaintiff's knee and

back pain had improved by 30%, and was rated at a level of five to six out of ten.

       <u>Non-Medical</u>

       A fraud investigation on Plaintiff's claim was initiated in March 2006, in part due

to the involvement of an unreliable treating source and non-attorney representative.  Plaintiff was

interviewed on March 4, 2006.  The investigation report details the interview, and the

information Plaintiff provided the investigator, including: Plaintiff did not inform the INS that

she was disabled because they never asked; she came to the United States on July 1, 2005, on an

invitation from her brother-in-law; she gained entry to the U.S. through the Refugee program,

alleging religious persecution; she was told before she immigrated that she could apply for

government assistance when she got to the U.S., and never had any intention of working; she left

behind her retirement pension when she left the Ukraine; regardless of whether she gets

disability, she will not work and her family will have to take care of her, even if her ailments are

corrected; and she was evasive and unable to explain how she and her family pay the bills.  The

investigator observed that Plaintiff was evasive throughout the interview, and was able to sit in

her chair at the kitchen table for approximately 1.5 hours, without appearing to be in any pain or

discomfort.

       <u>Hearing Testimony</u>

       Plaintiff testified at the administrative hearing through an interpreter.  Responding

to the ALJ's direct questioning, Plaintiff testified that she lives with her husband and four of her

children, aged 16, 20, 25, and 27.  She immigrated to the United States from the Ukraine July 21, 2005.[4]  She was confused as to the exact amount of schooling she had, estimating she had completed eight years in school, and three years of vocation school.  Her vocational school consisted of training in construction and commercial studies, which included bookkeeping and accounting for the construction industry.  She was never able to work as a bookkeeper due to her religion.  Her last job was in the boiler station in 2002, where she worked as a boiler operator.  Her duty was to watch the boiler, check the water level and temperature, open and close the valves, and clean the boiler.  She was also responsible for putting water in the boiler with a hose.  She was required to walk to check the boiler, then could sit.  She inspected the boiler at least twelve to fifteen time a day.  In order to inspect the boiler, she had to climb up to the second floor.  The heaviest object she had to lift were buckets of water weighing ten to twenty kilograms.  She had to use the buckets of water when the pumps did not work, and for use in keeping the working area clean.  She had an assistant, who fixed the boiler when it was broken.  She worked at this job from 1987 to 2002.

Her treating physician is Dr. Polskiy, who she first saw in October 2006.

In response to questioning from her representative, she testified that she did not have a drivers license due to her health condition, weakness and numbness in her hands and legs, and dizziness.  She has varicose veins, arthritis, numbness, and sharp pains in her legs.  She wears writs splints at night, and compressive stockings.  She can walk for maybe forty minutes, then she has to lay down and put her legs up as directed by her doctor.  She has to elevate her legs three times a day for an hour each, which helps a little.  She can sit for maybe one hour without feeling uncomfortable or pain.  When she sits longer, she has pain in her leg.  She has received medication and physical therapy for her pain.  The physical therapy works for some

---

[4]     This date differs from the date reported in the fraud investigation.  According to the investigation report, Plaintiff immigrated on July 1, 2005; her testimony at the administrative hearing was that she immigrated on July 21, 2005.

1  time, and then the pain comes back.  She is limited in her ability to lift things because her right

2  hand is very weak and she drops things.  She also cannot lift, push or bend due to back pain.  Her

3  children vacuum and do the laundry.  Plaintiff can cook some light meals, but she also has taught

4  her children how to cook, so she will direct them.  When she cooks, it is only for about fifteen

5  minutes.  She shops with her husband, for thirty to forty minutes.

6          Jim van Eck testified as the vocation expert.  He summarized Plaintiff's

7  vocational history as having an SVP 4, or the upper range of semiskilled work at the light

8  exertion.  Upon question by Plaintiff's representative, Mr. van Eck stated typically light work is

9  described as work requiring standing for two hour intervals before being given a break.  Sitting

10  can be done during a break or lunch, which is between a half an hour to an hour at midday,

11  followed by another break.  Breaks are between ten to fifteen minutes.  Pushing and pulling is

12  similar to strength, which at the light exertion is twenty pounds occasionally, ten pounds

13  frequently.  A person working with light exertion would not normally have an opportunity to lay

14  down and accommodate her body for relief.

15                              **III.  STANDARD OF REVIEW**

16          The court reviews the Commissioner's final decision to determine whether it is:

17  (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a

18  whole.  See Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999).  "Substantial evidence" is

19  more than a mere scintilla, but less than a preponderance.  See Saelee v. Chater, 94 F.3d 520, 521

20  (9th Cir. 1996).  It is ". . . such evidence as a reasonable mind might accept as adequate to

21  support a conclusion."  Richardson v. Perales, 402 U.S. 389, 402 (1971).  The record as a whole,

22  including both the evidence that supports and detracts from the Commissioner's conclusion, must

23  be considered and weighed.  See Howard v. Heckler, 782 F.2d 1484, 1487 (9th Cir. 1986); Jones

24  v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985).  The court may not affirm the Commissioner's

25  decision simply by isolating a specific quantum of supporting evidence.  See Hammock v.

26  Bowen, 879 F.2d 498, 501 (9th Cir. 1989).  If substantial evidence supports the administrative

1   findings, or if there is conflicting evidence supporting a particular finding, the finding of the

2   Commissioner is conclusive.  See Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th Cir. 1987).

3   Therefore, where the evidence is susceptible to more than one rational interpretation, one of

4   which supports the Commissioner's decision, the decision must be affirmed, see Thomas v.

5   Barnhart, 278 F.3d 947, 954 (9th Cir. 2002), and may be set aside only if an improper legal

6   standard was applied in weighing the evidence, see Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th

7   Cir. 1988).

8                                    **IV.  DISCUSSION**

9          Plaintiff argues the ALJ erred in two ways: (1) the ALJ erred in discounting her

10  treating physician's opinion; and (2) the ALJ's RFC determination failed to include all of her

11  impairments.

12                **A.      MEDICAL OPINIONS**

13         Plaintiff claims the ALJ improperly rejected her treating physician's opinion as to

14  her abilities.  She also argues the ALJ improperly reversed the preferred hierarchy of medical

15  opinion weighting, and erred in adopting the non-examining physician's finding of abilities, and

16  rejecting the treating and examining physician's opinions, without properly setting forth specific

17  and legitimate reasons for doing so.

18         Defendant argues that the ALJ rejected Plaintiff's treating physician's and the

19  consultative examining physician's (CE) opinions for specific and legitimate reasons, and there

20  was no error.

21         The weight given to medical opinions depends in part on whether they are

22  proffered by treating, examining, or non-examining professionals.  See Lester v. Chater, 81 F.3d

23  821, 830-31 (9th Cir. 1995).  Ordinarily, more weight is given to the opinion of a treating

24  professional, who has a greater opportunity to know and observe the patient as an individual,

25  than the opinion of a non-treating professional.  See id.; Smolen v. Chater, 80 F.3d 1273, 1285

26  (9th Cir. 1996); Winans v. Bowen, 853 F.2d 643, 647 (9th Cir. 1987).  The least weight is given

1    to the opinion of a non-examining professional.  See Pitzer v. Sullivan, 908 F.2d 502, 506 & n.4

2    (9th Cir. 1990).

3              In addition to considering its source, to evaluate whether the Commissioner

4    properly rejected a medical opinion the court considers whether:  (1) contradictory opinions are

5    in the record; and (2) clinical findings support the opinions.  The Commissioner may reject an

6    uncontradicted opinion of a treating or examining medical professional only for "clear and

7    convincing" reasons supported by substantial evidence in the record.  See Lester, 81 F.3d at 831.

8    While a treating professional's opinion generally is accorded superior weight, if it is contradicted

9    by an examining professional's opinion which is supported by different independent clinical

10   findings, the Commissioner may resolve the conflict.  See Andrews v. Shalala, 53 F.3d 1035,

11   1041 (9th Cir. 1995).  A contradicted opinion of a treating or examining professional may be

12   rejected only for "specific and legitimate" reasons supported by substantial evidence.  See Lester,

13   81 F.3d at 830.  This test is met if the Commissioner sets out a detailed and thorough summary of

14   the facts and conflicting clinical evidence, states her interpretation of the evidence, and makes a

15   finding.  See Magallanes v. Bowen, 881 F.2d 747, 751-55 (9th Cir. 1989).  Absent specific and

16   legitimate reasons, the Commissioner must defer to the opinion of a treating or examining

17   professional.  See Lester, 81 F.3d at 830-31.  The opinion of a non-examining professional,

18   without other evidence, is insufficient to reject the opinion of a treating or examining

19   professional.  See id. at 831.  In any event, the Commissioner need not give weight to any

20   conclusory opinion supported by minimal clinical findings.  See Meanel v. Apfel, 172 F.3d 1111,

21   1113 (9th Cir. 1999) (rejecting treating physician's conclusory, minimally supported opinion);

22   see also Magallanes, 881 F.2d at 751.

23             Here, the ALJ made the following findings in regards to the medical opinions of

24   Plaintiff's treating physician, the CE, and the non-examining agency assessor:

25             As for the opinion evidence, the undersigned gives the
                 greatest weight to the opinion provided by Disability

26             Determinations Services sources regarding the claimant's

exertional limitations because this opinion is best supported by the record which primarily shows complaints of musculoskeletal pain, exacerbated by obesity, with limited clinical findings and only occasional exacerbations. However, the manipulative limitations assessed by Disability Determination Services are not supported by later records which did not show continuing complaints or symptoms related to this disorder, as explained above.

The standing/walking limitations assessed by Dr. Borges are not supported by the record based on the generally normal clinical findings involving the lower extremities. Also, as explained above, although the claimant has had exacerbations of back pain resulting in radiculopathy, there is no evidence that these symptoms were ongoing, but instead, they resolved in a short period with physical therapy and minimal medication. The manipulative limitations assessed by Dr. Borges are not supported for the same reasons noted above in the review of the Disability Determinations Service source opinion.

Dr. Polskiy assessed severe limitations in standing, walking, sitting, and lifting which would preclude the claimant from performing even sedentary work on a full time basis. He indicated that the limitations were due to low back pain and varicose veins. However, it is noted that he provided this assessment in August 2007, at which time the claimant was experiencing an acute exacerbation of back pain. Physical therapy records show that the claimant's back pain and functioning improved after only a few weeks of physical therapy. The record does not support a conclusion that the claimant was limited to such a severe degree for any continuous 12 month period. Indeed, the minimal and conservative treatment recommended by Dr. Polskiy and limited use of pain medication suggests that the claimant was not limited to this degree on an ongoing basis.

(CAR 20).

The medical opinions contained in the record include from a treating physician, an examining physician, and a non-examining physician. The treating physician's opinion was contradicted by both the examining and non-examining physicians' opinions. The treating physician's opinion was that Plaintiff was significantly limited in her abilities, and could sit, stand, or walk for less than one hour each, could not lift or carry more than five to ten pounds. This is contradicted by the examining physician's opinion that Plaintiff could sit for six hours, and stand or walk for a maximum of two hours, limited to fifteen to thirty minutes at a time, and could lift or carry ten pounds frequently up to a maximum of twenty pounds.

1    In order to reject Plaintiff's treating physician's opinion of her limitations, based

2    on the contradicting opinion of the examining physician, the ALJ was required to set forth

3    specific and legitimate reasons for doing so, supported by substantial evidence in the record.  The

4    ALJ did so, citing the success of the physical therapy in improving her pain and functioning, as

5    well as the minimal and conservative treatment recommended, and limited use of pain

6    medication.  The reasons the ALJ set forth are specific and legitimate, and are supported by

7    substantial evidence.  This evidence includes the physical therapy notes, which indicate

8    significant improvement and decrease in pain, minimal clinical findings supported by x-rays

9    showing only mild lumbar scoliosis and spondylosis, and no indication that she was prescribed

10   pain medication on a chronic basis, but rather only occasionally, most of which was over the

11   counter (i.e., ibuprofen and Tylenol).  Therefore, the undersigned finds the rejection of Plaintiff's

12   treating physician's opinion as to her significant limitations to be supported by substantial

13   evidence and proper legal analysis.

14   In addition, the ALJ rejected a portion of the examining physician's opinion as to

15   Plaintiff's limitations.  The CE limited Plaintiff's ability to stand or walk to two hours maximum,

16   and only in fifteen to thirty minutes intervals.  The ALJ rejected this limitation as "not supported

17   by the record based on the generally normal clinical findings involving the lower extremities."

18   (CAR 20).  He gave the greatest weight to the non-examining physician's determination of

19   limitation as the opinion "best supported by the record which primarily shows complaints of

20   musculoskeletal pain, exacerbated by obesity, with limited clinical findings and only occasional

21   exacerbations."  (CAR 20)  The ALJ further supported his opinion by finding that the severity of

22   the limitations Plaintiff alleged "are not credible because of the meager objective clinical

23   findings, the conservative treatment, and effectiveness of limited treatment in improving pain and

24   functioning."  (CAR 20).  The "generally normal clinical findings" the ALJ referred to included a

25   determination that Plaintiff's varicose veins had improved with the use of compression stockings

26   and over-the-counter pain medication, her complaints of low back pain, hip pain, and ankle pain

15

had been intermittent, and the x-rays were either totally normal or showed only mild abnormalities.  In addition, the ALJ pointed out that while she had experienced radiculopathy and there was evidence of sensory neuropathy in the lower extremities in October 2006, and she had an exacerbation of back pain in August 2007, she had been treated routinely and showed improvement with the use of over-the-counter pain medication and brief periods of physical therapy.  The ALJ also determined that "[t]here was no continuous 12 month period throughout which the claimant was unable to perform light work."  (CAR 20).

The ALJ also rejected the gross manipulations restrictions the CE found.  The CE stated she is limited in "the use of her hands for gross manipulation to an occasional basis." (CAR 169).  The ALJ recognized that Plaintiff had been diagnosed with carpal tunnel syndrome in October 2005, but noted she had been treated conservatively with wrist splints and over-the-counter pain medication.  He also noted that the objective findings have shown she had good manual dexterity, and that the treatment record shows few if any continuing complaints of carpal tunnel syndrome symptoms after May 2006.  The ALJ also noted that Plaintiff's treating physician did not include any limitations due to her carpal tunnel in his assessment of her abilities.  In addition, no surgery has been performed or recommended.  Therefore, the ALJ found this impairment had improved with the conservative treatment and did not result in limitations for twelve or more months.  However, he found given her history of carpal tunnel, a light work determination was reasonable.

Plaintiff argues the ALJ's decision is not supported by substantial evidence, and that the ALJ was not just required to give sufficient reasons for disregarding medical testimony, but was required to set forth the substantial evidence.  As discussed above, substantial evidence means more than a mere scintilla, but less than a preponderance.  The ALJ is responsible for resolving conflicts in medical testimony, and the court is required to uphold the ALJ's decision where the evidence is susceptible to more than one rational interpretation.  Finally, the ALJ must support his decision to disregard the medical testimony with specific and legitimate reasons,

1   which is supported by substantial evidence.

2          As discussed above, the ALJ set forth not only specific and legitimate reasons for

3   discounting the examining physician's limitations as to Plaintiff's standing and walking abilities,

4   as well as her gross manipulation abilities, but clear and convincing reasons.  Those reasons are

5   supported by substantial evidence, as set forth in the ALJ's opinion.  In addition, his decision is

6   supported by the non-examining physician's findings of Plaintiff's abilities.  While a non-

7   examining physician's opinion should be discounted, and is not to be considered substantial

8   evidence, when it is contradicted by all the other evidence in the record, such is not the case here.

9   See Magallanes, 881 F.2d at 752-53 (citing Gallant v. Heckler, 753 F.2d 1450, 1454 (9th Cir.

10  1984); Millner v. Schweiker, 725 F.2d 243, 246 (4th Cir. 1984).  The non-examining physician's

11  opinion is not contradicted by *all* the evidence in the record.  Instead, although it contradicted the

12  limitations found by the other physicians, it is supported by the objective evidence in the record,

13  as discussed above.

14          Plaintiff also argues that the ALJ did not rely on evidence to support his decision,

15  but rather relied on speculation and conjecture, and misstatements of the clinical findings.  The

16  undersigned finds no support for this argument in the record.  While the evidence may support a

17  different conclusion, there is sufficient evidence to support the ALJ's decision, and that decision

18  is not to be overturned on such a record.

19          **B.    RESIDUAL FUNCTIONAL CAPACITY**

20          Plaintiff next alleges the ALJ erred in not including in his RFC all of Plaintiff's

21  impairments.  Specifically, she claims the ALJ failed to include her carpal tunnel syndrome, left

22  foot bone spur, obesity, varicose veins, lower extremity edema, gastroesophageal reflux disease,

23  frequent headaches, left shoulder tendinitis, hip pain, ankle pain, stress urinary incontinence,

24  polyneuropathy, restless leg syndrome, and left knee arthritis. She argues the ALJ was required to

25  include all of her impairments, regardless of whether they are serious, in formulating her RFC,

26  which he failed to do.

Plaintiff's claim essentially argues three theories.  First, it appears she is arguing the ALJ erred in his determination as to her severe conditions at step two of the sequential analysis.  Second, she appears to argue the ALJ failed to conduct a multiple impairment analysis. Finally, she seems to argue the ALJ erred in finding her severe conditions did not result in significant limitations.

Residual functional capacity is what a person "can still do despite [the individual's] limitations." 20 C.F.R. §§ 404.1545(a), 416.945(a) (2003); see also Valencia v. Heckler, 751 F.2d 1082, 1085 (9th Cir. 1985) (residual functional capacity reflects current "physical and mental capabilities").  Thus, residual functional capacity describes a person's exertional capabilities in light of his or her limitations.[5]  The burden is on the claimant to prove "not only the existence of an impairment but that the impairment prevents him from performing his past work." Macri v. Chater, 93 F.3d 540, 543 (9th Cir. 1996) (citing Matthews v. Shalala, 10 F.3d 678, 681 (9th Cir. 1993).

1.  Severity Determination

In order to be entitled to benefits, the plaintiff must have an impairment severe enough to significantly limit the physical or mental ability to do basic work activities.  See 20

---

[5]     Exertional capabilities are the primary strength activities of sitting, standing, walking, lifting, carrying, pushing, or pulling and are generally defined in terms of ability to perform sedentary, light, medium, heavy, or very heavy work.  See 20 C.F.R., Part 404, Subpart P, Appendix 2, § 200.00(a).  "Sedentary work" involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  See 20 C.F.R. §§ 404.1567(a) and 416.967(a).  "Light work" involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  See 20 C.F.R. §§ 404.1567(b) and 416.967(b).  "Medium work" involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  See 20 C.F.R. §§ 404.1567(c) and 416.967(c).  "Heavy work" involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.  See 20 C.F.R. §§ 404.1567(d) and 416.967(d).  "Very heavy work" involves lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more. See 20 C.F.R. §§ 404.1567(e) and 416.967(e).

1   C.F.R. §§ 404.1520(c), 416.920(c).[6]   In determining whether a claimant's alleged impairment is

2   sufficiently severe to limit the ability to work, the Commissioner must consider the combined

3   effect of all impairments on the ability to function, without regard to whether each impairment

4   alone would be sufficiently severe.  See Smolen v. Chater, 80 F.3d 1273, 1289-90 (9th Cir.

5   1996); see also 42 U.S.C. § 423(d)(2)(B); 20 C.F.R. §§ 404.1523 and 416.923.  An impairment,

6   or combination of impairments, can only be found to be non-severe if the evidence establishes a

7   slight abnormality that has no more than a minimal effect on an individual's ability to work.  See

8   Social Security Ruling ("SSR") 85-28; see also Yuckert v. Bowen, 841 F.2d 303, 306 (9th Cir.

9   1988) (adopting SSR 85-28).  The plaintiff has the burden of establishing the severity of the

10  impairment by providing medical evidence consisting of signs, symptoms, and laboratory

11  findings.  See 20 C.F.R. §§ 404.1508, 416.908. The plaintiff's own statement of symptoms alone

12  is insufficient.  See id.

13          Here, the ALJ found Plaintiff had the following severe impairments: varicose

14  veins, mild scoliosis and spondylosis of the lumbar spine, a history of bilateral carpal tunnel

15  syndrome, left foot bone supr, and obesity.  By definition, these severe impairments had more

16  than a minimal effect on Plaintiff's work-related functioning.  The ALJ found Plaintiff's other

17  impairments to be non-severe, including: plantar fasciitis (diagnosed on only one occasion),

18  gastroesophageal reflux disease (successfully controlled with medication), headaches (infrequent

19  complaints, and generally controlled with over-the-counter medication), left shoulder tendinitis

20  (resolved with physical therapy), hip and ankle pain (normal x-rays, but was considered with

21  other musculoskeletal disorders), stress urinary incontinence (conservative treatment and no

22  interference with work related functioning), and mental impairment (only one note for referral,

23

24          [6]    Basic work activities include: (1) walking, standing, sitting, lifting, pushing,
        pulling, reaching, carrying, or handling; (2) seeing, hearing, and speaking; (3) understanding,
25      carrying out, and remembering simple instructions; (4) use of judgment; (5) responding
        appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes
26      in a routine work setting.  See 20 C.F.R. §§ 404.1521, 416.921.

but no follow-up and no allegation).

As to each of Plaintiff's impairments the ALJ found to be non-severe, that determination is supported by the evidence. There is no evidence in the record that any of these, either alone or in combination, had more than a minimal impact on her abilities. Significantly, Plaintiff does not identify any limitation due to these impairments, nor did she claim any of them as severe impairments in her application or at any point in the proceedings before the ALJ. Therefore, to the extent Plaintiff argues the ALJ erred in his determination that she has several impairments which are not severe, the undersigned finds no basis for that argument. The ALJ's finding of severity is supported by substantial evidence, and is based on proper legal analysis.

### 2. Multiple Impairment Analysis

Plaintiff argues the ALJ failed to include all of her impairments, both severe and non-severe, in formulating his RFC. It therefore appears she is arguing that his multiple impairment analysis was erroneous.

"An ALJ is not required to discuss the combined effects of a claimant's impairments or compare them to any listing in an equivalency determination, unless the claimant presents evidence in an effort to establish equivalence." Burch v. Barnhart, 400 F.3d 676, 682 (9th Cir. 2005) (citing Lewis v. Apfel, 236 F.3d 503, 514 (9th Cir. 2001)). "When a claimant suffers from multiple impairments, the Commissioner must consider their combined effect in determining whether the claimant is disabled." Macri v. Chater, 93 F.3d 540, 545 (9th Cir. 1996) (citing Gregory v. Bowen, 844 F.2d 664, 666 (9th Cir. 1984) (per curiam)).

In addition, obesity has been removed from the Listing of Impairments. Obesity may still enter into a multiple impairment analysis, but "only by dint of its impact upon the claimant's musculoskeletal, respiratory, or cardiovascular system." Celaya v. Halter, 332 F.3d 1177, 1181 n.1 (9th Cir. 2003). Thus, as part of his duty to develop the record, the ALJ is required to consider obesity in a multiple impairment analysis, but only where it is "clear from the record that [the plaintiff's] obesity . . . could exacerbate her reported illnesses." Id. at 1182;

1   see also Burch v. Barnhart, 400 F.3d 676, 682 (9th Cir. 2005) (distinguishing Celaya and

2   concluding that a multiple impairment analysis is not required where "the medical record is silent

3   as to whether and how claimant's obesity might have exacerbated her condition" and "the

4   claimant did not present any testimony or other evidence . . . that her obesity impaired her ability

5   to work").  Where a multiple impairment analysis is not required, the ALJ properly considers

6   obesity by acknowledging the plaintiff's weight in making determinations throughout the

7   sequential analysis.  See Burch, 400 F.3d at 684.

8            Where, as here, a claimant has multiple impairments, none of which meets the

9   listing requirements, the ALJ must determine whether the impairments in the aggregate are

10  equivalent to a listed impairment.  See 42 U.S.C. § 423(d)(2)(B); Burch v. Barnhart, 400 F.3d

11  676, 682 (9th Cir. 2005).  It is the claimant's burden, however, to specify which listing she meets

12  or equals and set forth evidence that would support the diagnosis and finding of a listed

13  impairment.  See Burch, 200 F.3d at 683.

14           Here, the ALJ wrote six pages analyzing and summarizing the medical evidence.

15  Included in that analysis, the ALJ specifically addressed each of Plaintiff's impairments, finding

16  that she had only been treated once or very rarely, the condition was not continuous for a 12-

17  month period, or conservative treatment was successful in treating the condition.  Substantial

18  evidence in the record and discussed by the ALJ supports the ALJ's determination that Plaintiff's

19  impairments in combination do not meet or equal an impairment listed.

20           In addition, the ALJ found Plaintiff's obesity to be a severe impairment, and

21  included it in his multiple impairment analysis.  The ALJ specifically found Plaintiff's

22  "musculoskeletal impairments, in combination with obesity, have not resulted in motor loss,

23  reflex changes, neurological deficits or the degree of functional loss required by the

24  musculoskeletal listings."  (CAR 15).  Plaintiff has not identified any evidence in the record

25  which undermines this finding.

26  ///

1    Accordingly, to the extent Plaintiff is arguing the ALJ erred in his multiple

2    impairment analysis, the court finds no support for the argument in the record.  The ALJ's

3    decision is supported by substantial evidence, and was based on proper legal analysis.

4                        3.  Effects of Severe Impairments

5    Finally, Plaintiff argues the ALJ erred in finding that she has severe impairments,

6    but not finding those severe impairments have a significant impact on her ability to work.

7    As defined above, a severe impairment is one that has more than a minimal effect

8    on an individual's ability to work.  However, the finding that an impairment is severe at step two

9    does not equate to a finding that the impairment has a significant impact on that individual's

10   ability to work.  A severe impairment may only limit a claimant's ability in a minor way, but still

11   have a more than a minimal effect.  Therefore, Plaintiff's argument that a finding of severity at

12   step two automatically is sufficient to find a significant limitation is not supported.

13   In addition, the ALJ did in fact find Plaintiff's severe impairments had a

14   significant effect on her ability to perform work activities, and limited her abilities to light work

15   with only occasional climbing, stooping, kneeling, crouching, squatting, or crawling.  By

16   definition, light work involves limited lifting abilities (no more than twenty pounds occasionally,

17   ten pounds frequently), and the ability to stand or walk for six hours in an eight hour work day

18   with normal breaks.  The ALJ therefore found Plaintiff did not have the unlimited capability to

19   perform all work, but that she was limited to only light work.  This was due to a finding that her

20   severe impairments limited her ability in more than a minimal way.

21   Specifically, the ALJ discussed each of Plaintiff's severe impairments.  As to

22   Plaintiff's varicose veins, which the ALJ found likely exacerbated by her obesity, he found she

23   reported improvement of that condition with the use of compression stockings and over-the-

24   counter pain medication.  Plaintiff argues improvement does not equal non-disability.  However,

25   the ALJ notes Plaintiff sought treatment for her varicose veins in August and October, 2005.  She

26   then reported good improvement in December 2005.  There is no indication in the record that she

1    ever sought treatment for that condition at any other time.  While the examining physician noted

2    the varicose veins, the only notation associated with that condition indicated she had good pulses.

3    As to Plaintiff's pain complaints (back, hip and ankle), the ALJ found she had only intermittant

4    complaints, and that the x-rays were either totally normal or showed only mild abnormalities,

5    noting evidence of radiculopathy and sensory neuropathy in October 2006 and exacerbation of

6    pain in August 2007.  He also noted her pain complaints were successfully treated with over-the-

7    counter medication and brief periods of physical therapy.   The ALJ also recognized her carpal

8    tunnel syndrome as having been diagnosed in October 2005 and treated conservatively with wrist

9    splints and over-the-counter pain medication, and few, if any, continuing complaints after May

10   2006.  Significantly, the ALJ noted that even Plaintiff's treating physician, who otherwise opined

11   the most significant limitations, did not include Plaintiff's carpal tunnel syndrome in his

12   assessment.  Plaintiff's obesity the ALJ addressed in his multiple impairment analysis as

13   required.

14           Finally, although the ALJ did not specifically address Plaintiff's bone spur as he

15   did the other impairments, he did address her ankle pain which appears to be related, and the

16   record as a whole supports the ALJ's finding of Plaintiff's limitations.  Throughout the decision,

17   the ALJ refers to the frequency of treatments sought, the conservative treatments received, the

18   positive response to over-the-counter medication, the limited clinical findings, and the minimal

19   abnormalities found in radiological tests.  All of these determinations are relevant to the ALJ's

20   determination of Plaintiff's RFC, and the effect of Plaintiff's conditions, including her bone

21   spurs.  The ALJ noted only one treatment note for bone spurs, including an x-ray finding, in

22   October 2005, for which Plaintiff was prescribed a soft insole for her shoe.  Other than a finding

23   of tenderness on examination by the CE, there is no other indication she sought treatment for her

24   heel spur.  In addition, the CE assessed some postural limitations (limited bending, squatting, and

25   stooping due to her heel pain), which the ALJ acknowledged in his RFC (finding she is only

26   capable of occasional climbing, stooping, kneeling, crouching, squatting, or crawling).  As

1  discussed above, the ALJ's reliance on the medical opinions in the record, and the weight given

2  thereto, was not erroneous.

3           The ALJ found Plaintiff capable of performing the full range of light work, except

4  that she was somewhat limited in her ability to climb, stoop, kneel, crouch, squat, or crawl.  He

5  indicated the full range of light work requires standing or walking for a total of approximately six

6  hours in an eight hour work day with normal work breaks.  He therefore found she is capable of

7  performing her past relevant work as a boiler operator.  The ALJ specifically found that this

8  position, as performed, required Plaintiff to walk for two hours, stand for two hours and sit for

9  four hours.  In addition, she was required to stoop for one hour and reach for one hour, but did

10  not have to kneel, crouch, crawl, or handle or grasp any large objects.  She was not required to

11  lift objects heaver than ten pounds, despite that she testified to lifting up to twenty kilograms

12  because that was inconsistent with her earlier statements and her description of her job duties.

13  Plaintiff does not object to this description of her past relevant work.

14           The ALJ's determination of Plaintiff's abilities, and limitations thereon, is

15  supported by substantial evidence in the record.  The only evidence that Plaintiff's impairments

16  are disabling is her own testimony and statements, which the ALJ determined to be not credible

17  "because of the meager objective clinical findings, the conservative treatment, and effectiveness

18  of limited treatment in improving pain and functioning."  (CAR at 20).   While Plaintiff does not

19  challenge the ALJ's determination of her credibility, the court finds the ALJ's determination was

20  supported by specific, cogent reasons.  See Rashad v. Sullivan, 903 F.2d 1229, 1231 (9th Cir.

21  1990).  It is for the Commissioner to determine whether a disability applicant is credible, and the

22  court defers to the Commissioner's discretion if the Commissioner used the proper process and

23  provided proper reasons.  See Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1996).

24           Accordingly, the court finds the ALJ's determination of Plaintiff's limitations

25  based on her severe conditions is supported by substantial evidence in the record.

26  / / /

## V.  CONCLUSION

Based on the foregoing, the court concludes that the Commissioner's final decision is based on substantial evidence and proper legal analysis.  Accordingly, IT IS HEREBY ORDERED that:

1.     Plaintiff's motion for summary judgment (Doc. 15) is denied;

2.     Defendant's cross-motion for summary judgment (Doc. 16) is granted; and

3.     The Clerk of the Court is directed to enter judgment and close this file.

DATED:  September 30, 2009

_____
**CRAIG M. KELLISON**
UNITED STATES MAGISTRATE JUDGE